ANTHONY M. BARNES, SBN 199048
Email: amb@atalawgroup.com
JASON R. FLANDERS, SBN 238007
Email: jrf@atalawgroup.com
AQUA TERRA AERIS (ATA) LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Telephone: (917) 371-8293

*Attorney for Plaintiffs*
SAN JOAQUIN RAPTOR/WILDLIFE RESCUE CENTER
CENTRAL VALLEY SAFE ENVIRONMENT NETWORK
PROTECT OUR WATER

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN JOAQUIN RAPTOR/WILDLIFE RESCUE CENTER a non-profit corporation, CENTRAL VALLEY SAFE ENVIRONMENT NETWORK and PROTECT OUR WATER, a non-profit association,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>QUAD/GRAPHICS, INC., a Wisconsin corporation, QG PRINTING II LLC, a Connecticut limited liability company,<br><br>                    Defendants. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

SAN JOAQUIN RAPTOR/WILDLIFE RESCUE CENTER ("SJR/WRC"), CENTRAL VALLEY SAFE ENVIRONMENT NETWORK ("CVSEN"), and PROTECT OUR WATER ("POW") (collectively, "SJR/WRC, CVSEN & POW" or "Plaintiffs"), by and through its counsel, hereby alleges:

## I.       JURISDICTION AND VENUE

1.       This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.       On June 4, 2020, SJR/WRC, CVSEN & POW issued a 60-day notice letter ("Notice Letter") to Quad/Graphics, Inc. and QG Printing II LLC ("Defendants" or "QG II"), for the industrial facility in Merced, California under its control. The Notice Letter informed Defendants of its violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ*) ("1997 Permit"), as superseded by Order No. 2014-0057-DWQ and amended by Order No. 2015-0122–DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2015 Permit") (collectively, hereinafter referred to as the "Storm Water Permit"), and the Clean Water Act at QG II 's commercial printing facility located at 2201 Cooper Ave, Merced, CA 95348 with Waste Discharger Identification Number (WDID) 5F24I009101 ("QG II Facility" or "Facility"). The Notice Letter informed Defendants of SJR/WRC, CVSEN & POW's intent to file suit against Defendants to enforce the Storm Water Permit and the Clean Water Act.

3.       The Notice Letter was sent to Defendants' current Chief Executive Officer, Joel Quadracci, registered agent for service of process, CSC – Lawyers Incorporating Service, and the Environmental Manager Tom Estock, as required by 40 C.F.R. § 135.2(a)(2). The Notice Letter was also sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Central Valley Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. §

1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is fully incorporated herein by reference.

4.     More than sixty (60) days have passed since the Notice Letter was served on the Defendants and the State and Federal agencies. SJR/WRC, CVSEN & POW are informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

5.     Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II.     INTRODUCTION

6.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as, high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

7.     This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendants'

substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendants' operations at the QG II Facility.[1]

8.   SJR/WRC, CVSEN & POW specifically allege violations regarding Defendants' discharge of pollutants from the Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III.   PARTIES

### A.   San Joaquin Raptor/Wildlife Rescue Center, Central Valley Safe Environment Network and Protect Our Water

9.   SJR/WRC is a California non-profit 501(c)(3) public benefit conservation and research organization with its principal place of business in Merced, California. CVSEN & POW are non-profit associations. SJR/WRC, CVSEN & POW's organizational purposes include wildlife rescue, and preservation of wildlife habitats, the environment, and the waterways in the San Joaquin Valley, including but not limited to Black Rascal Creek, Bear Creek and the San Joaquin River upon which wildlife depends. SJR/WRC's, CVSEN's & POW's efforts to protect the resources of the San Joaquin Valley include air and water quality, the preservation of agricultural land, and the protection of wildlife and its habitat. Both entities are also committed to public education regarding these various issues and ensuring governmental compliance with the law of this state. Members of SJR/WRC, CVSEN & POW use and enjoy California's numerous rivers, creeks and waterways for recreation and other activities, including Bear Creek, Black Rascal Creek and the San Joaquin River, where they view and enjoy wildlife, rescue and rehabilitate wildlife, boating, birdwatch, and engage in scientific study, among other things. SJR/WRC, CVSEN & POW's members derive significant and ongoing use and enjoyment from the aesthetic, recreational, and conservation benefits of the San Joaquin Valley watersheds.

10.   SJR/WRC, CVSEN & POW collectively have approximately 1,800 members, collectively, who live, recreate and work in and around waters of the State of California, including the Bear Creek and the San Joaquin River watersheds. SJR/WRC, CVSEN & POW are dedicated to

---

[1] The Facility is fully described in Section V below.

the preservation, protection, and defense of the environment, and the wildlife and the natural resources of all waters of California. To further these goals, SJR/WRC, CVSEN & POW are actively seeking federal and state agency implementation of the Clean Water Act and other laws and, where necessary, directly initiating citizen enforcement. As referenced herein, members of SJR/WRC, CVSEN & POW use and enjoy the Receiving Waters herein into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged. Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of SJR/WRC & POW's members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act and/or the Storm Water Permit. The relief sought herein will redress the harms to Plaintiffs caused by Defendants' activities.

11.     Defendants' failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to Defendants' discharge of polluted stormwater and non-stormwater from the QG II Facility, negatively impacts and impairs SJR/WRC, CVSEN & POW's members' use and enjoyment of these waters.

12.     Continuing commission of the acts and omissions alleged herein will irreparably harm SJR/WRC, CVSEN & POW's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B. The Owners and/or Operators of the QG II Facility**

13.     SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that Quad Graphic, Inc. and QG Printing II are both headquartered at N61 W23044 Harry's Way, Sussex WI 53089.

14.     SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that Defendants are the owners of Quad Graphic, Inc. and QG Printing II.

15.     SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that Defendants are the operators of the QG II Facility.,

16.     SJR/WRC, CVSEN & POW refer to Defendants and their management herein as the "Owners/Operators" of the Facility.

17.     SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that Quad Graphics, Inc. is an active California corporation and QG Printing II is an active limited liability company, each registered in California.

## IV.     STATUTORY BACKGROUND

### A.     The Clean Water Act

18.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

19.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

20.     Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

21.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

22.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

23.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive

materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

24.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

25.     "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

26.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

27.     The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.

28.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

29.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

30.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

31.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard

or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

32.     The Defendants are "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

33.     An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

34.     Pursuant to sections 309(d) and 505 of the Clean Water Act, each separate violation of the CWA occurring before November 2, 2015 subjects the violator to a penalty of up to $37,500 per day; violations occurring after November 2, 2015 and assessed on or after January 15, 2018 subjects the violator to a penalty of up to $53,484 per day. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

35.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.     California's Storm Water Permit**

36.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

37.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Water Quality Control Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

38.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25.

Violations of the Storm Water Permit are also violations of the CWA. 1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

39.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(1).

40.     Under the applicable EPA regulations  all surface and ground waters of the State of California are considered to be suitable, or potentially suitable, for municipal or domestic water supply and should be so designated by the Regional Boards unless a strict use attainability analysis is performed based upon a structured scientific assessment of the factors affecting the attainment of uses specified in Section 101(a)(2) of the Clean Water Act (the so called "fishable/swimmable" uses). 40 CFR 131.10(a) and (g).

41.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

42.     On July 1, 2015 the 2015 Permit became effective and was issued as NPDES General Permit No. CAS000001 (the same NPDES permit number as the 1997 Permit). 2015 Permit, Section I(A) (Finding 4). The 2015 Permit superseded the 1997 Permit except for enforcement purposes. *Id.* at Section I(A) (Finding 6). The substantive requirements of the 2015 Permit are the same or more stringent than the requirements of 1997 Permit.

43.     On November 6, 2018, the State Board issued an amended but not yet adopted Order No. 2015-0122-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Amendment").

44.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, p. II-V; 2015 Permit, Section I(A) (Findings 8, 12).

Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 1997 Permit, Provision E(1), Finding 3; 2015 Permit, Section I(A) (Finding 17), Section II(B).

45.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

**C.  The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

46.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit, Discharge Prohibition A(1); 2015 Permit, Discharge Prohibition III(B).

47.     Effluent Limitation (B)(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

48.     Discharge Prohibition (A)(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

49.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 1997 Permit, Effluent Limitation B(3); 2015 Permit, Effluent Limitation V(A). EPA has developed benchmark levels ("Benchmarks") that are objective

guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

50.     The EPA established Parameter Benchmark Values for the following parameters, among many others: total suspended solids ("TSS")—100 mg/L; oil & grease ("O&G")—15 mg/L; total organic carbon ("TOC")—110 mg/l; aluminum ("Al")—0.75 mg/l; iron ("Fe")—1 mg/l; copper ("Cu")—0.0123 mg/l; zinc ("Zn")—.11 mg/L; pH—6-9 s.u.; and nitrate & nitrite nitrogen ("N+N")—0.68 mg/L. The Basin Plan's Water Quality Standards for the Central Valley Region requires a narrower pH range of 6.5—8.5 pH units. The 2015 Permit contains Numeric Action Levels ("NALs") for these same parameters that generally mirror the Benchmark Values.

51.     The 2015 Permit includes NALs. 2015 Permit, Section I(M) (Finding 62). During the public commenting period, the State Board stated that "NALs are not designed or intended to function as numeric technology-based effluent limitations." State Board 2012 Draft Industrial General Permit Response to Comments, Response #6 to Comment #12; *see also* 2015 Permit Section I(M) (Finding 63).

52.     Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges from adversely impacting human health or the environment.

53.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation.

54.     Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

55.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

56.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

57.     The State Water Quality Control Board has issued the Water Quality Control Plan for the Central Valley Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan states the "All waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." Basin Plan, 3.1.20. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. Basin Plan, Table 3-1. The Basin Plan decrees that waters shall not contain chemical constituents, discoloration, substances or floating material in concentrations that cause nuisance or adversely affect beneficial uses Id. at 3.1

58.     In addition to the de facto beneficial uses of swimming and fishing applicable to the Receiving Waters herein (*see* 40 CFR 131.10(a) and (g)), the Basin Plan also identifies present and potential beneficial uses for various hydrologic units leading to the San Joaquin River, with municipal and domestic supply, agricultural supply, warm and cold migration, contact and non-contact water recreation, cold and warm freshwater habitat, wildlife habitat, and warm and cold spawning among them. The Basin Plan further notes that surface waters with the beneficial uses of groundwater recharge, freshwater replenishment, and preservation of rare and endangered species have not been identified in this plan with surface waters of the Sacramento and San Joaquin River Basins falling within these beneficial use categories will be identified in the future. Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan or deemed on a case-by-case basis would be designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act.

59.     According to the 2016 303(d) List of Impaired Water Bodies Black Rascal Creek is listed for toxicity, dissolved oxygen, and indicator bacteria, and Bear Creek is listed for the

following CWA 303(d) impairments: toxicity and indicator bacteria. Thus, the receiving waters for pollution from the QG II Facility are impaired, and the Defendants' illegal discharges of pollutants above the WQS contributes to the continued impairment of the beneficial uses in the watershed.

60.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

61.     The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[2]

62.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

63.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

64.     Receiving Water Limitations C(3) and C(4) of the 1997 Permit require a permittee whose discharges exceed the Storm Water Permit's Receiving Water Limitations to submit a written report identifying what additional BMPs will be implemented to achieve water quality standards.

**D.  The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

65.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Section A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with

---

[2] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* 1997 Permit § B(10)(b); 2015 Permit, Attachment H at 18.

industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

66.    The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

67.    The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit, Section A(2); 2015 Permit, Section X.

68.    The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Section A(9); 2015 Permit, Section X(A)(9). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results, a visual

inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

69.     Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. Storm Water Permit, Section A(9)(d)(i)-(vi). If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the Storm Water Permit. *Id*., Section A(9)(d). The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. *Id*.

70.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via SMARTS within 30 days. 2015 Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year.[3] *Id.* at Section X(B)(3); 2015 Permit, Fact Sheet, Section II (I)(1).

**E.  The Storm Water Permit's Monitoring and Reporting Requirements**

71.     The 1997 Permit required facility operators to develop and implement a monitoring and reporting plan ("M&RP") when industrial activities begin at a facility. 1997 Permit, Sections B(1)-(2) and E(3). The 2015 Permit updated the terminology to a Monitoring Implementation Plan ("MIP"). SJR/WRC, CVSEN & POW refers to the M&RP and MIP as "MIP" from here forward in this complaint. The MIP must ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit. *Id.* at Section B(2). The MIP must ensure that practices at the facility to prevent or

---

[3] A reporting year under the Storm Water Permit is July 1 to June 30.

reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

72.     The objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit, Sections B(2)(a) and B(2)(b); 2015 Permit, Section XI.

73.     The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id.*, 1997 Permit Section B(2)(c) and B(2)(d).

74.     The 2015 Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. 2015 Permit, Sections I(J) (Findings 55-56) and XI.

75.     Section B(2)(d) of the 1997 Permit and Section XI(A)(4) of the 2015 Permit require that the MIP shall be revised as necessary to ensure compliance with the Storm Water Permit.

76.     Section B(4)(a) of the 1997 Permit and Section XI(A) of the 2015 Permit require dischargers to conduct monthly visual observations of storm water discharges.

77.     Section B(4)(c) of the 1997 Permit and Section XI(A)(2) of the 2015 Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit, Section B(4)(c); 2015 Permit, Section X(B)(1).

78.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 1997 Permit, Sections B(5) and B(7); 2015 Permit Section XI(B)(4).

79.     Section B(5)(a) of the 1997 Permit requires dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

80.     Section B(5)(b) of the 1997 Permit requires that sampling conducted pursuant to the Storm Water Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without storm water discharge.

81.     Section B(5)(c)(i) of the 1997 Permit requires dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and TOC. A discharger may substitute analysis for O&G instead of TOC.

82.     Section B(5)(c)(ii) of the 1997 Permit requires dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

83.     Section B(14) of the 1997 Permit requires that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

84.     Section B(15)(f) of the 1997 Permit requires that sampling and analysis be performed according to Section B of the 1997 Permit.

85.     Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

86.     Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June

30). Dischargers are required to submit the storm water sample analyses to the State Board and Regional Board.

87.     Section XI(B)(6) of the 2015 Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

88.     Section XVI of the 2015 Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of the Storm Water Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

89.     Section XII(C) of the 2015 Permit requires a discharger to execute a Level 1 Exceedance Response Actions ("ERA") Evaluation and prepare a Level 1 ERA Report should they exceed a Numeric Action Level ("NAL") for any required sampling and analysis parameter under the 2015 Permit, or a Level 2 ERA and prepare a Level 2 ERA Report should they exceed a NAL for two consecutive two consecutive reporting years, for any required sampling and analysis parameter under the 2015 Permit The ERA Evaluation should identify additional BMPs and SWPPP revisions needed to prevent future NAL exceedances and comply with the 2015 Permit. Based upon the ERA Evaluation(s), the discharger shall as soon as practicable, but not later than January 1, submit an ERA Report and certify that the ERA Report includes: 1) a summary of the ERA Evaluation, 2) a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL. Level 2 ERA report requirements are more stringent than a Level 1 ERA report.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

## V. STATEMENT OF FACTS

### A. Quad/Graphics, Inc. and QG Printing II Facility Site Descriptions

90.     QG II operates an industrial facility located at 2201 Cooper Ave, Merced, CA 95348 California that consists of approximately 40 acres, all of which is industrial and exposed to storm water. The Facility's general purpose is commercial lithographic printing. The QG II Facility operates 24 hours per day, seven days per week.

91.     The QG II Facility's NOI states that Defendants operates the Facility under Standard Industrial Classification ("SIC") Code 2752, covering establishments primarily engaged in printing by the lithographic process.

92.     Under SIC Code 2752, the Storm Water Permit requires QG II to analyze storm water samples at QG II Facility for pH, total suspended solids, and oil & grease.

93.     Facilities must sample and analyze for additional parameters identified on a facility-specific basis to reflect a facilities pollutant source assessment, as required by the 2015 Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. 1997 Permit, Section B.5.c.i; 2015 Permit, Section XI.B.6. The QG II Facility's June 2017, SWPPP requires testing for pH, total suspended solids, oil & grease, and arsenic, boron, group a pesticides, chlorpyrifos, diazinon, E. coli, mercury, specific conductance, and DDT due to the Receiving Water impairment. Over the recent years the Facility has also sampled for total organic carbon, copper, and nitrate + nitrate nitrogen, among other pollutants.

94.     SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that industrial activities and corresponding industrial areas at the Facility include: the warehouse structure and adjacent above ground storage tanks, the loading and unloading areas, storage areas, the loading and unloading dock, the rails loading and unloading area, the print floor and printing areas, containment areas, oil storage area, waste paper balers, industrial gas storage and cannister area, the ink storage area, UV coating area, metal roll off bins area, chemical drum storage areas, the production sink, hazardous waste storage areas, the printing areas, and right of ways and parking for industrial vehicles. The Facility also has an office and cooling units with exhaust portals on the roof which may release pollutants from inside the Facility building to surfaces where they can contact storm water and discharge to the Receiving Waters.

95.     SJR/WRC, CVSEN & POW are informed and believes, and thereon alleges that industrial all of the industrial activities and areas at the Facility are in furtherance of large scale commercial lithographic printing and other commercial printing.

96.     SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that pollutant sources at the Facility include chemicals, lubricants, diesel fuel, oils and solvents used in the printing press units, ink, and suspended solids and dust from vehicle traffic and sediment.

97.     SJR/WRC. CVSEN & POW are informed and believe, and thereon allege, that each of the industrial activities, industrial areas, and industrial materials referenced herein impact and potentially impact stormwater and non-stormwater runoff and discharges at the QG II Facility.

**B.     Bear Creek and Black Rascal Creek.**

98.     Merced County is located in central California and situated across the center of the San Joaquin Valley and is located approximately 100 miles east of San Francisco. The foothills of the Sierra Nevada Mountains border Merced County on the east and are composed of gently rolling hills leading to the sharper terrain of the Sierra in the background. The western edge of Merced County is bounded on the by coastal ranges. The aesthetics of the mountains and hills vary with the season, with golden brown hues through most of the year and green due to the winter rains. Seasonal contrasts of swollen rivers and lush hillsides and snowcapped mountain views add to the scenic nature of a thriving agricultural area. Preservation of natural riparian habitat, and scenic values of the County's streams, creeks, and lakes carry significant importance for the inhabitants of the area.

99.     Merced County is also home to certain critical habitat designations from the United States Fish and Wildlife Services, including areas home to the California tiger salamander a species listed as threatened by the U.S. Fish and Wildlife Service in 2004. Pollutants from industrial activities, among other threats, can destroy or degrade aquatic habitat essential for breeding and rearing for this and other species. Other species of concern known to inhabit the county are as follows: western spadefoot, western pond turtle, Swainson's hawk, Burrowing owl, Northern harrier, Loggerhead shrike, Tricolored blackbird, Western red bat, American badger, and San Joaquin kit fox. Other species of concern that depend on surface water in Merced County include all species of raptors, four (4) species of Fairy shrimp and eleven (11) floral species indigenous to

vernal pools.

### C.  The QG II Facility's Storm Water Permit Coverage

100.    The Facility's NOI lists the Receiving Water as the Black Rascal Creek which flows into Bear Creek very near to the QG II Facility. Bear Creek flows into San Joaquin River. Black Rascal Creek and Bear Creel are waters of the United States within the meaning of the CWA.

101.    The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the current Facility Waste Discharge Identification ("WDID") number for the QG II Facility as 5F24I009101. SMARTS lists the Facility coverage under the Storm Water Permit as "Active."

102.    Via search of the SMARTS database, SJR/WRC, CVSEN & POW obtained a SWPPP for the Facility dated June 2017 ("Facility SWPPP").

103.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that the Facility's SWPPP fails to describe and/or adequately describe all of the Facility's industrial activities.

104.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that Facility's Owners/Operators sampled three times during the 2017-2018 reporting year, and only once during in the 2019-2020, in violation of the 2015 Permit.

105.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that pollutants associated with the Facility include, but are not limited to: copper, total suspended solids, aluminum, iron, zinc, nitrate + nitrate nitrogen, pH, and oil & grease.

106.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that without properly identifying all industrial activities or all significant materials at the Facility in the SWPPP, the Owners/Operators have not developed and/or implemented all appropriate BMPs.

107.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that the Facility SWPPP failed to implement the minimum BMPs required by the Storm Water Permit, including: sufficient good housekeeping requirements; preventive maintenance requirements; aerial deposition control; material handling and waste management requirements; employee training and quality assurance; and record keeping.

108.   SJR/WRC, CVSEN & POW are informed and believe, and thereon allege that QG II has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the Storm Water Permit's effluent limitations. 1997 Permit, Section A.8.b; 2015 Permit, Sections X.H.2.

109.   SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that Defendants has failed to collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at least June 4, 2015.

110.   SJR/WRC, CVSEN & POW are informed and believe, and thereon allege that violations of TSS, O&G, Cu, and N+N, among other constituents, occur each time storm water or non-storm water discharges from the Facility, in violation of the 1997 Permit, Discharge Prohibition A.2, Receiving Water Limitations C.1 and C.2, and 2015 Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.

111.   SJR/WRC, CVSEN & POW are informed and believe, and thereon allege that the repeated and significant exceedances of Benchmark Levels demonstrate that the Owners/Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

112.   SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that the Owners/Operators have failed and continue to fail to evaluate the effectiveness of the Facility BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm water discharges. Further, Defendants have failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

113.   SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

114.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that the Owners'/Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with its industrial activities to precipitation, and that this results in discharges of polluted storm water from the Facility and into local waterways in violation of the Storm Water Permit and/or the Clean Water Act.

115.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants into the Receiving Waters.

**D.    Storm Water Discharges from the QG II Facility**

116.    Pursuant to the Facility SWPPP, the Facility is divided into two (2) drainage areas. Storm water runoff associated with industrial activities from the north and east side of the main structure is said to be directed to an onsite storm water retention basin. All other storm water runoff is directed into a City of Merced storm drain which, upon information and belief, discharges to Black Rascal Creek which flows into Bear Creek less than a half mile from the Facility. Storm water is discharged from the Facility from Outfall A and Outfall B, with Outfall C flowing into the onsite basin to infiltrate. Outfall A drains runoff from the southeast section of the site including a portion of the roof, landscaped areas, the front parking lot and industrial areas adjacent to building 4. Outfall B discharges storm water from the southwest west section of the property and include the shipping entryway and shipping dock, parts of the roof, landscaped areas, the employee and overflow parking lots, and industrial areas adjacent to building 2. Outfall C receives runoff from drainage areas on the north side of the property and portions of the east side of the property, including parts of the facility roof, the pallet storage area, a gravel road, and an open field.

**E.    The QG II Facility's Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants**

117.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that pollutants from QG II Facility discharge into Black Rascal Creek and Bear Creek, traditionally navigable waters.

118.    The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. *See* 40 C.F.R. § 122.2. The EPA interprets waters of the

United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

119.   SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that polluted storm water and non-storm water discharges from the Facility to the Receiving Waters.

120.   Storm water discharges containing pollutants, including but not limited to TSS, pH, Fe, Zn, N+N, and TOC, adversely affect the aquatic environment.

121.   Samples of storm water discharges collected at Facility contain pollutants in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, and Benchmarks, in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

122.   SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that during and/or after every significant rain event[4] or any other storm water or non-storm water discharge that has occurred at the Facility since June 4, 2015, through the present, Defendants have discharged and continue to discharge storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the Benchmarks, CTR, and the WQS.

**F.   Defendants' Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements**

123.   SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that Defendants failed and continues to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section B of the 1997 Permit, and Section XI of the 2015 Permit.

124.   SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that Defendants failed and continue to fail to revise the MIP for the Facility as necessary to ensure

---

[4] A significant rain event is an event that produces stormwater runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

compliance with the 1997 Permit, in violation of Section B(2)(d), and Section XI of the 2015 Permit.

125.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that Defendants failed and continue to fail to collect or analyze any storm water samples at the Facility, in violation of Section B and Provision E(3) of the 1997 Permit and Section XI of the 2015 Permit.

126.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that Defendants have failed and continues to fail to sample storm water discharges from all discharge locations, in violation of Section B(7) of the 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

127.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that Defendants failed and continue to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Sections A(9) and A(10) of 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

128.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that the Owners/Operators of the QG II Facility consistently fail to perform visual observations of storm water during QSEs.

129.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted, including: 1) a description of the noncompliance and its cause, 2) the period of noncompliance, 3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and 4) steps taken or planned to reduce and prevent recurrence of the noncompliance as required by the 1997 Permit, Section C(11)(d).

130.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that the Owners/Operators did not report their non-compliance as required.

131.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that the Owners/Operators of the Facility consistently fail to collect storm water samples during QSEs.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

132.    Information available to SJR/WRC, CVSEN & POW also suggests that the BMPs proffered as implemented in the Facility's SWPPPs are insufficient and ineffective in reducing pollutants to levels compliant with the CWA.

133.    SJR/WRC, CVSEN & POW are informed and believe, and thereon allege, that the Facility Owners/Operators failed and continue to fail to submit adequate ERA Reports in recent reporting years to the Regional Board for the Facility with BMP upgrades that meet BAT/BCT, in violation of Section XII(C) of the 2015 Permit.

134.    SJR/WRC, CVSEN & POW are informed and believe, and thereon alleges, that Defendants has failed to submit complete Annual Reports to the Regional Board for at least the last four Reporting Years in violation of Section B(14) of the 1997 Permit, and Section XVI of the 2015 Permit.

135.    SJR/WRC, CVSEN & POW are informed and believe, and thereon alleges that Defendants failed to submit reports required by Receiving Water Limitations C(3) and (C)(4) of the 1997 Permit.

**VI.    CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**Discharges of Contaminated Storm water in Violation of**
**the Storm Water Permit's Effluent Limitations and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

136.    SJR/WRC, CVSEN & POW incorporates the allegations contained in the above paragraphs as though fully set forth herein.

137.    SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that Defendants failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

138.    SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and

the CWA. *See* 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

139.    The Owners/Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

140.    SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

141.    Each day since at least May 18, 2015 that the Owners/Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

142.    By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 18, 2015to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

143.    An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm SJR/WRC, CVSEN & POW has no plain, speedy, or adequate remedy at law.

144.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

<u>**SECOND CAUSE OF ACTION**</u>
**Defendants' Discharges of Contaminated Storm water in Violation of**
**the Storm Water Permit's Receiving Water Limitations and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

145.    SJR/WRC, CVSEN & POW incorporates the allegations contained in the above paragraphs as though fully set forth herein.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

146.   SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

147.   SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of WQS has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

148.   The Owners/Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

149.   SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

150.   Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

151.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 18, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

152.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

153.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

**THIRD CAUSE OF ACTION**
**Defendants' Failure to Adequately Develop, Implement, and/or**
**Revise a Storm Water Pollutant Prevention Plan in Violation of the**
**Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

154.    SJR/WRC, CVSEN & POW incorporates the allegations contained in the above paragraphs as though fully set forth herein.

155.    SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

156.    SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement the SWPPP for the Facility, in violation of the Storm Water Permit.

157.    SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

158.    The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from May 18, 2015 to the present.

159.    The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

160.    The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

161.    Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

162.    By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 18, 2015to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

163.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

irreparably harm SJR/WRC, CVSEN & POW, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

164.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**FOURTH CAUSE OF ACTION**
**Defendants' Failure to Adequately Develop, Implement, and/or**
**Revise a Monitoring Implementation Plan in Violation of**
**the Storm Water Permit and the Clean Water Act.**
**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

165.    SJR/WRC, CVSEN & POW incorporates the allegations contained in the above paragraphs as though fully set forth herein.

166.    SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

167.    SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

168.    SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

169.    The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from May 18, 2015to the present.

170.    The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

171.    The Owners/Operators will continue to be in violation of Section B and Provision E(3) of the 1997 Permit, Section XI of the 2015 Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

172.    Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

173.     By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 18, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

174.     An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm SJR/WRC, CVSEN & POW, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

175.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**FIFTH CAUSE OF ACTION**
**Defendants' Failure to Report as Required by the Storm Water**
**Permit in Violation of the Storm Water Permit and the**
**Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

176.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

177.     SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that the Facility Owners/Operators have failed and continue to fail to sufficiently sample and analyze storm water in violation of Section XI(B)(2) and (B)(6) of the 2015 Permit

178.     SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that the Facility Owners/Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections XI and XVI of the 2015 Permit.

179.     SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that the Facility Owners/Operators failed and continue to fail to submit adequate ERA Reports to the Regional Board for the Facility with BMP upgrades that meet BAT/BCT, in violation of Section XII(C) of the 2015 Permit.

180.     SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that the Facility Owners'/Operators' Annual Reports failed and continue to fail to meet the monitoring and

reporting requirements of the Storm Water Permit, in violation of Section B(14) of the 1997 Permit and Sections XI and XVI of the 2015 Permit.

181.    SJR/WRC, CVSEN & POW is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have failed and continue to fail to submit complete Annual Reports to the Regional Board, in violation of Sections XI and XVI of the 2015 Permit.

182.    The Facility Owners/Operators have been in violation of Sections XI, XII and XVI of the 2015 Permit since July 1, 2015.

183.    The Facility Owners/Operators have been in violation of the reporting requirements of the Storm Water Permit each day it has operated the Facility without reporting as required by Receiving Water Limitations C(3) and C(4) of the 1997 Permit, and Sections XI, XII(C) and XVI of the 2015 Permit.

184.    The Owners/Operators have been in violation of Sections XI, XII(C) and XVI of the 2015 Permit since at July 1, 2015.

185.    The Owners'/Operators' violations of the reporting requirements of the 2015 Permit and the CWA are ongoing and continuous.

186.    By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 18, 2015to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

187.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm SJR/WRC, CVSEN & POW, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

188.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## VII.    RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a.      A Court order declaring Defendants to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b) for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.      A Court order enjoining Defendants from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.      A Court order assessing civil monetary penalties for each violation of the CWA occurring prior to November 2, 2015 at $37,500 per day per violation, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

d.      d.      A Court order assessing civil monetary penalties for each violation of the CWA at $37,500.00 per violation per day, pursuant to Sections 309(d) and 505 of the CWA occurring after December 6, 2013 through November 2, 2015, and $55,800 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after January 13, 2020. See 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

e.      A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f.      Any other relief as this Court may deem appropriate.

DATED: October 2, 2020

Anthony M. Barnes
Aqua Terra Aeris Law Group Attorneys for Plaintiffs
San Joaquin Raptor/Wildlife Rescue Center, Central Valley Safe Environment Network and Protect Our Water

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES